UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-CR-399 |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Judge Manesh Shah |
| | ) | |
| THEODORE J. WOJTAS, JR., | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

**T.J. WOJTAS' SUBMISSION
IN AID OF SENTENCING AND WITH RESPECT TO SENTENCING
FACTORS SET FORTH IN 18 U.S.C. § 3553**

T.J. Wojtas ("Wojtas") comes before this Court for sentencing in connection with his conviction on five counts of mail fraud and one count of wire fraud relating to an alleged scheme involving a condominium investment program the government claims to have been illegal. Wojtas proceeded to trial and was found guilty.

Wojtas presents a powerful case for the exercise of extreme leniency in terms of the factors set for in 18 U.S.C. § 3553(a). First, as set forth in detail in Wojtas' April 5, 2018 Rule 29 Supplemental Motion and his April 12, 2018 Version of the Offense, the nature and circumstances of the offense were that Wojtas was committed to disclosure, disclosures were provided, and Wojtas employed professionals to vet the investment program. Second, Wojtas' personal history establishes he has been nothing but a hard working, kind, generous man of the highest morality and character whose priorities are his family, his friends and his community. Third, other defendants convicted of mortgage fraud in this district who have been found guilty

of more severe conduct than was Wojtas, have received significant departures from the advisory sentencing guidelines.

This submission will first discuss sentencing guideline issues. The submission will then turn in greater detail to the factors set forth in 18 U.S.C. § 3553 and discuss the reasons that these factors justify a significant departure from the advisory sentencing guidelines.

**I.     Disagreements With the Advisory Guideline Computation in the PSR**

**A.     Contrary to The PSR, The Government Has Not Established $14,762,093 In Losses Attributable To The Scheme Charged In The Indictment**

The government bears the burden of supporting the adjustments to the advisory sentencing guidelines for which they advocate. In this case, the government has taken the position that guideline loss is $14,762,093 based on a spreadsheet that contains only a figure for "amount" (of loss) with no supporting documentation regarding any of the specific loans for which loss is claimed. For some of the banks listed on the spreadsheet, such as Lehman Brothers, there was no evidence submitted at trial to support the loss figure. Furthermore, given that there was fraud by Wojtas codefendants Manglardi (such as providing buyers with false employment information) in which Wojtas did not participate, it is far from clear that the fraud of which Wojtas was convicted was the same or sufficiently related to the fraud that caused each of the listed banks a loss. Finally, there is insufficient information in the loss chart to determine whether the claimed loss amount includes interest or other fees that are not to be included in a loss calculation on a mortgage fraud case. Without this, more detailed information, it is impossible to verify whether or not the loss figure proposed by the government is a figure that meets the criteria for properly includable guidelines loss.

**B.     The Leader Organizer Adjustment Does Not Apply to Wojtas**

2

Neither the PSR nor the Government Version sets forth information as to which employees Wojtas directed in criminal activity and the leader organizer enhancement can therefore not be applied to him. Application Note 4 to U.S.S.G. § 3B1.1(a) provides:

> …Factors the court should consider include the exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over them.

The argument for application of the leader organizer enhancement in the Government Version and PSR seems to be that as one of the 3 original partners behind the Woods at Countryside condominium development, Wojtas can properly be viewed as a leader organizer. But that is not the law.

In order to properly apply the leader organizer enhancement, "the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime." *United States v. Carson*, 9F.3d 576, 585 (7th. Cir. 1993), *United States v. Barnes*, 117 F.3d 328, 337 (7th. Cir. 1997). The leader organizer enhancement is not to apply to defendants who merely manage a business or property used in the fraud. *United States v. Shuh*, 289 F.3d 968, 972 (7th Cir. 2002). And the fact that a defendant may have controlled an employee in work duties does not mean he controlled their criminal activities. *United States v. Forchette*, 220 F.Supp.2d 914, 919 (E.D. Wis. 2002). *See also United States v. Patel*, 131 F.3d 1195, 1202-1203 (7th Cir. 1997) (Remanded when district court did not make independent findings that the defendant controlled another person in criminal activity); *United States v. Jewel*, 947 F.2d 224, 235-236 (7th Cir.

3

1991) (Remanded when the district court did not identify the people the defendant supervised who were the basis for application of the enhancement).

In this case, the government has produced no evidence that Wojtas directed employees involved in the passive investment program in a fraud. Indeed, the trial evidence was the opposite. Wendy Kullas testified that Wojtas directed her that she had to keep making disclosure to the lending banks of payments to seller affiliated entities on the HUD-1s even when those disclosures resulted in the loss of numerous condominium sales. (Tr. 1413-1414) The only evidence at trial of a defendant directing others in criminal conduct involved Manglardi and not Wojtas. The government has produced no evidence of a single person that Wojtas directed in criminal conduct. The 4-point leader organizer enhancement does not apply.

      C.      **The Probation Office Incorrectly Applied the Sophisticated Means Adjustment.**

The PSR concluded that the 2-point sophisticated means adjustment should be applied in this case because the defendants used corporate entities to fund down payments and to declare bankruptcy. PSR ¶ 31. The PSR does not state, because it is not the case, that corporate entities were designed or used to conceal the identity of defendant Wojtas. Indeed, the evidence at trial was that Wojtas conducted seminars with hundreds of people openly discussing his role at the Woods of Countryside. Use of the corporate entities had a business purpose. It was not designed to conceal or disguise involvement in the project. Under the Guideline Advisory Note to the sophisticated means enhancement as well as the law of the Seventh Circuit, the adjustment is properly applied in cases involving "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."[1] The Application Note further

---

[1] Application Note 8(b), U.S.S.G. § 2B1.1(b)(10)(C)

4

provides that an example of sophisticated means in a telemarketing scheme would be "locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction" and that "conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts" also is ordinarily indicative of sophisticated means.[2]

According to the law of the Seventh Circuit, offense conduct is sophisticated means if it displays "a greater level of planning or concealment than *a typical fraud of that kind.*" *United States v. Wayland*, 549 F.3d 526, 528 (7th Cir. 2008) (emphasis supplied). The Court in *United States v. Lewis*, 93 F.3d 1075 (2d. Cir. 1996) explained, along the same lines, "Whether a scheme is sophisticated must be viewed in light of the fraudulent conduct and differentiated by assessing the intricacy or planning of the conduct from similar offenses conducted by different defendants." *Lewis* 93 F.3d at 1080.

A typical mortgage fraud case that includes the marketing of condominium units involves corporate entities. Critically, there is no evidence that Wojtas in any way attempted to conceal his involvement in the Woods at Countryside or hide behind corporate entities. Indeed, as mentioned above, he conducted public seminars on the investment project. Therefore, this factor cannot be used to distinguish this case from other frauds of the same type. The PSR incorrectly concluded that this factor could appropriately be used as a basis on which to apply the sophisticated means enhancement and improperly applied the enhancement.

**II.     The Factors Set Forth in 18 U.S.C § 3553(a) Establish That Wojtas Should Receive A Significant Departure From the Advisory Guidelines.**

Title 18 U.S.C. §3553(a) provides the framework for the imposition of federal sentences. *See Gall v. United States*, 552 U.S. 38 (2007); *United States v. Booker,* 543 U.S. 220 (2005).

---

[2] *Id.*

The statutory factors set forth in 18 U.S.C. § 3553(a) are intended to assist the Court in arriving at a just sentence, "sufficient but not greater than necessary" to achieve the purposes of sentencing.

The law that has developed since *Booker* makes clear that the Guidelines are only advisory and are not the only consideration at sentencing. *Gall*, 552 U.S. at 49. Rather, the Guidelines provide a starting point that Courts must consider. Courts should not, however, presume that the Guideline range is reasonable and need not find "extraordinary circumstances to justify a sentence outside the Guideline range." *Id*. at 47. In the place of a mechanical application of the guidelines, Courts are to conduct an individual assessment of each case based on the applicability of the factors set forth in § 3553(a), which correspond to the purposes of sentencing. In a statement on the topic of the proper consideration to be given to §3553(a) factors, the Supreme Court, in *Pepper v. United States*, reaffirmed the principle that the sentencing courts are to give due consideration to the individual being sentenced. 131 S. Ct. 1229, 1235 (2011) ("Highly relevant if not essential to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."); *see also United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011).

In this case, a thorough consideration of § 3553(a) factors including the nature and circumstances of the offense, the history and characteristics of the defendant, and the concern of avoiding unwarranted sentencing disparity for similarly situated defendants argue powerfully for a sentence significantly below the advisory guidelines.

    A.    **Nature and Circumstances of the Offense: 18 U.S.C. § 3553(a)(1)**

        1. **Mitigating Trial Evidence**

Detailed arguments about the nature and circumstances of the offense have been presented to the Court in Wojtas' April 5, 2018 Rule 29 Supplemental Motion and his April 12, 2018 Version of the Offense. These arguments need not be repeated in this submission. In summary, however, the following facts about the case are appropriately considered in mitigation of the offense. First, it is undisputed that Wojtas disclosed the basic workings of the condominium investment program in large very public presentations that were attended and/or sponsored by banks. Second, as the Court's June 25, ruling on Wojtas' Rule 29 motion ("Ruling") made clear, reference was made to the Master Lease in correspondence with the lending banks and the HUD-1 statements disclosed money paid to Palatine Leasing Services Group and American Dream. Third, while the Ruling referred to American Dream making payments of down payments, there is no evidence that this happened on any closing in which Wojtas was involved. These were Manglardi's deals. Fourth, there is zero evidence that Wojtas was in any way involved in the misstatements in the loan applications cited in the Ruling such as inaccuracies about the residential use of the property or the buyer's income or employment. The trial evidence about these frauds related only to Manglardi. Fifth, it is inaccurate to state that Wojtas defrauded Fannie Mae and Freddie Mac. As acknowledged at trial by the government's witnesses, the lending bank, and not the developer, decides what information to turn over to Fannie Mae and Freddy Mac. Furthermore, the evidence at trial was that Fannie and Freddie acquired non-conforming loans based on clear information provided to them.[3] Sixth, and perhaps most critically, the evidence at trial was that Wojtas insisted on disclosures to banks

---

[3] Federal National Mortgage Association guidelines limit seller concessions to 3-9% of the sale price of the property if the sale was of a residential unit and 2% of the sale price for an investment property. (Tr. 123). But the facts at trial were that non-conforming payments *were disclosed on the HUD 1* (Gov. Ex. 53-F, Gov. Ex. 82-G).

even after having been informed that those disclosures would result in significant lost condo sales.[4]

### 2. Wojtas' Lawyers Confirm His Commitment To Disclosure

Authors of letters in support of Wojtas acted as his attorneys during the period of time of the convicted conduct. R. Kymn Harp explained that he and his law firm began assisting Wojtas and his company in 2009. Harp wrote that he was "struck by the high quality of legal representation T.J. had employed to acquire, finance, develop, and market the project in the first place. He had employed attorneys at McGuire Woods LLP, at Perkins Coie LLP, and at Meltzer Pertill and Stelle LLC."[5] Harp continued with his opinion that "the loan default issues faced by T.J.'s company resulted not from mismanagement or poor planning, but from the nationwide collapse of the economy that resulted in an inability to sell condominium units during the Great Recession."[6] Harp also observed that Wojtas was committed to disclosure stating, "In my own representation of T.J., I found him to be adamant about full disclosure, steering clear of controversy, and doing things right."[7] Finally, Harp opined that although "T.J. had development ambitions that sometimes exceeded his capacity,…I always felt that his motives were pure."[8]

Attorney Ronald A. Stearney, former Assistant Illinois Attorney General, echoed Harp's opinion about Wojtas' commitment to disclosure and to doing the right thing. Stearney observed, based on acting as Wojtas' counsel for approximately ten years, that Wojtas was "attentive to advice and counsel," that he "did not approach the relationship in the sense that he

---

[4] Wendy Kullas testified that Wojtas insisted that HUD-1 disclosures of payments to Palatine Leasing Setvices Group and American Dream would continue on the HUD-1s despite Wendy having informed him that the disclosures had cost them 5 closings that week and were in danger of costing them 17 more. (Tr. 1414-15, Gov. Ex. 231).
[5] Letter of R. Kymn Harp p. 3
[6] Id.
[7] Id.
[8] Id.

8

dictated the result he wanted, but "rather he consistently sought advice so as to avoid any legal issue at all."[9] Stearney continued that Wojtas had "a proven track record of retaining counsel to advise him" and that, in his experience, Wojtas did not "seek out ways to circumvent the law."[10]

Lonnie Berkeley, who represented Wojtas in real estate development since 2005, wrote to the Court that unlike other developers, Wojtas never fought her on difficult disclosure issues. Rather "he welcomed them and always said 'I want investors to have all the facts.'"[11] Berkeley continued that Wojtas was remarkably forthcoming and straightforward, held nothing back, and while he worked hard to make the project succeed, did not overpromise to anyone.[12]

Albert Castellan, a government witness at trial, who interacted with Wojtas regarding the purchase of 2 condo units at the Woods of Countryside (but ended up purchasing 9 units after interacting with Manglardi) also wrote on Wojtas' behalf. Castellan wrote that he did not believe that the Woods at Countryside was a fraud scheme.[13] Castellan opined that despite the fact that he lost money on his condo purchases, the program worked just as Wojtas said it would for a period of time and that "at least in [his] dealings with T.J., I don't believe that he lied to me or defrauded me."[14]

While Wojtas' trial counsel did not present an advice of counsel defense, it is a significant mitigating factor that lawyers and others with direct experience of the set up of the Woods of Countryside have opined that Wojtas sought out competent counsel to assist him with setting up the investment program and followed their advice including providing full disclosure of how the program worked.

---

[9] Letter of Ronald A. Stearney p. 1
[10] Id.
[11] Letter of Lonnie E. Berkeley p. 1
[12] Id.
[13] Letter of Albert Castellan p. 1
[14] Id.

9

B.    **Wojtas' History and Characteristics: 18 U.S.C. § 3553(a)(1)**

1.    **Personal Background**

Wojtas' childhood and early adult life was tumultuous. His father, a Korean War Veteran, was abusive. When his parents divorced when Wojtas was 13, he elected to remain with his mother even though he would have been better provided for financially by choosing to stay with his father.[15] Wojtas pledged to his mother when he was 13 to be a better man, father and son than his father had been.[16] He spent the past 30 plus years keeping that promise. In the late 1990s when Wojtas was still in his 20s, his mother became ill, Wojtas halted his studies to get a job and to earn money to pay for her health care.[17] He remained by her side every moment of her illness until her passing.

In 1999, when Wojtas was just embarking on his new married life, he took in his niece when his sister's struggles with substance abuse threatened to make her an orphan.[18] He raised his niece, Lily, as his own child and the fact that she emerged from such a difficult early childhood to become a well-adjusted adult is testimony to Wojtas' constant love and concern. R. Kymn Harp, who observed Wojtas with Lily found that the love and care that Wojtas provided to Lily was so great that he was certain that she was his biological daughter.[19]

2.    **Wojtas' Personal Integrity**

Many of the individuals who wrote to the Court on Wojtas' behalf commented upon his enormous personal integrity. Dean DeLisle, who testified at trial, wrote that he dealt with many businessmen, but that Wojtas "always had the utmost integrity and only had good intentions in

---

[15] Letter of Cornelia Miller p. 2
[16] Id. p. 1
[17] Letter of Yvonne Engelbrecht p. 3
[18] PSR p. 14 ¶ 58
[19] R. Kymn Harp p. 1

his work."[20] R. Kymn Harp observed that Wojtas was a hard worker who was always "fair in his dealings, often going beyond what was necessary."[21] Yvonne Engelbrecht wrote that she found Wojtas to be "incredibly hard working, honest, and fair."[22] Patrick McKinnon observed that Wojtas was "an example to be followed" in the manner in which he conducted his business as well as the love and respect he demonstrated for his family.[23]

### 3. Commitment To Family

Wojtas married Elena in 2000 and they now have 5 young boys ranging in age from ten years to ten months. Those that know Wojtas well commented on his incredible devotion to his boys and to his wife. But, more than that, they observed the high quality role model Wojtas has been in turning his boys into moral and upstanding adults. Lieutenant Colonel Michael Conklin wrote that he admired Wojtas' relationship with his sons in that he was kind and patient, but yet set boundaries and provided guidance to help them do the "right things" as they mature.[24] Wojtas is a hands on father who helps with homework and changes diapers, all the while teaching his boys right from wrong and giving them the gift of his time with them which they need and want.[25] Many letter writers could not even contemplate what would happen to the family without Wojtas' constant presence.

### 4. Wojtas' Commitment To Helping Others

Wojtas' enormous heart is not reserved for his immediate family. Based, perhaps, on the tragic childhood and young adulthood he endured, he has always been ready to reach out his hand to lift someone else up. Yvonne Engelbrecht described a situation in which an older

---

[20] Letter of Dean R. DeLisle p. 1
[21] Letter of R. Kymn Harp p. 2
[22] Letter of Yvonne Engelbrecht p. 1
[23] Letter of Pat McKinnon p. 1
[24] Letter of Michael J. Conklin p. 1
[25] Letter of Yvonne Engelbrecht p. 2

employee had become obsolete. Although there was no necessity or budget for her, even in tough financial times for the company, Wojtas insisted that she remain employed and remain employed doing something that made her feel useful.[26] For Yvonne, Wojtas was her support when she lost her mother-in-law, when she was fighting for a lung transplant for her brother-in-law, and when she suddenly and tragically lost her nephew on his 21st birthday.[27] For Peter J. Goergen III, Wojtas was a port in the storm when he was going through a divorce.[28] For R. Kymn Harp, Wojtas provided solace as he confronted the struggles of dealing with his son's medical and emotional problems.[29] Wojtas' history of kindness, charity, and genuine empathy for the struggles of others is significant mitigating evidence in this case.

### III.  Unwarranted Sentencing Disparities- 18 U.S.C. §3553(a)(2(B) &(C)

Comparing Wojtas to other similarly situated defendants[30] who have been convicted or mortgage fraud offenses in the Northern District of Illinois evidences the fact that Wojtas' conduct was significantly less severe, even if one accepts the specific misconduct specified in the Government Version and the Ruling (i.e. incorrect statements about the number of condo units sold and about the existence of a $100 million fund). The defendants in these cases received downward departures that cut their sentences into a fraction of the advisory guideline level argued for by the government.

In the case of George Kouvelis 13 CR 892 (Durkin, J.) the defendant was a corrupt real estate developer who, from 2008-2012, bought properties in economically depressed areas on the south side of Chicago and then sold the properties at inflated values to fraudulently qualified

---

[26] Id p. 1
[27] Id. p. 1
[28] Letter of Peter J. Goergen III p. 1
[29] Letter of R. Kymn Harp p. 2
[30] To ensure that the comparisons in this filing are to similarly situated defendants, only defendants who the government has described as organizers or developers will be discussed. Lower level loan officers, recruiters, sellers and buyers will be ommitted.

buyers. He paid the buyers to purchase the properties and hid payments from the lenders. Defendant also paid another entity to provide the buyers with the downpayments. Defendant's advisory guidelines were 33-41 but as explained by the government, the economic hard did not account for the tremendous harm to the already blighted communities of adding more foreclosed properties to the community. He received a sentence of 24 months.

A similar case in which the advisory guidelines were even higher was that of defendants Steve Klebosits and his partner Thomas Hyland 12 CR 568 (Coleman, J.) In that case, according to the government, defendant Klebosits masterminded a scheme to sell 26 properties on the economically depressed south side to fraudulently qualified buyers. Defendant owned and controlled various LLCs that profitted from the sales and profitted as buyers who did not care about the properties or the community caused additional harm to the area of the properties. Defendant's partner, also an organizer, assisted in the fraud. The fraud included falsely qualifying buyers, giving them the money for the down payment, and paying buyers to make the purchases. The fraud damaged lenders with loss of more than $7 million. Significantly, however, in asking that the defendant be sentenced withi the advisory guideline range of 121-151 months, the government emphasized the damage that this fraud caused to the community and noted that defendant lived in a wealthy suburb with his profits while causing additional blight to an already economivally disadvantaged area. Klebosits was sentenced to 35 months despite advisory guidelines of 121-151 months. His partner, Hyland, was sentenced to 24 months with advisory guidelines of 41-51 months.

Another case that is instructive is that of defendants Earldean Jackson 10 CR 737 (Lefkow, J.) In that case the defendant, described by the government as an organizer, purchased properties in both a real and a fake name using different social security numbers and also

13

purchased properties under aliases. Defendant cashed checks and deposited them with his company and later filed bankruptcy (fraudulently) to avoid foreclosures. In all, defendant's brazen fraud caused $1.8 million of loss. Because of a pattern of criminal activity in the defendant's past, he had a criminal history III. Notwithstanding all of these facts, defendant, whose guideline range was 51-63 months, was sentenced to 18 months. A codefendant, Venus Jackson, also an organizer, who engaged in similar misconduct, received a 30 month sentence on an advisory guideline sentence of 63-78 months.

Another defendant, Wanda Rivera-Barton, received a sentence of 24 months with advisory guidelines of 121-151 months. (Pallmeyer, J.) Barton, who the government describes as an organizer, was a licensed realtor who owned a realty and management company. Between 2004 and 2007, she obtained 42 mortgage loans and $15 million in loan proceeds from lenders. Rivera-Barton made false statements to lenders in the loan applications including false employment, false income, and false occupancy verification. Defendant fraudulently took finders fees and commissions from the builders and, in all, caused $4.5 million in loss.

Defendant Hakeem Rashid was sentenced to 36 months with advisory sentencing guidelines of 151-188 months. (Gettleman, J.) Rashid, described by the government as an organizer, was a licensed loan originator employed by two mortgage brokerage companies. He owned a company and LLC both of which were involved in the fraud. Defendant issued 35 mortgages for $16.2 millionfrom lenders with false statements on the HUDs, false statements about the buyers' incomes, employment, financial condition, and intent to occupy. Defendant recruited buyers into the fraud scheme and refinanced mortgages through false statements about his qualifications.

Evident from these sentences, all imposed in the Northern District of Illinois, is that Wojtas' conduct in this case was much less clearly fraudulent conduct. Unlike these defendants, Wojtas was not responsible for the buyers provideing false information on their loan applications or providing false information to lenders on HUD-1s and loan documents. Unlike the defendants in these cases whose brazen frauds could never have resulted in loans that survived and were serviced, Wojtas' investment program, in the words of numerous individuals who testified at trial, functioned exactly as it was supposed to function. Wojtas' conduct that the government and Court have found to be fraudulent, consisted of working under an investment program in which a series of documents established that money would be returned to buyers in exchance for their giving up a portion of the equity in their homes, making statements about a fund that was never listed on any loan documents that supposedly induced buyers to make the purchases, and misrepresenting the number of condo untis sold. Even if these actions took place and were fraud, they are dwarfed by the vastly more culpable conduct of the defendants in the above cited cases. Wojtas' conduct was significantly less serious than the conduct of these defendants and he should be sentenced more leniently than were they.

For all of the reasons set forth above Wojtas asks the Court to impose a significantly below guideline sentence under the facts and circumstances of this case.

Respectfully submitted,

By:  /s/ *Carolyn Pelling Gurland*

Carolyn Gurland
414 North Clay Street
Hinsdale, IL 60521
(312) 420-9263
cgurland@comcast.net

## CERTIFICATE OF SERVICE

I, Carolyn Pelling Gurland, an attorney for Defendant T.J. Wojtas, hereby certify that on this, the 27th day of June, 2018, I caused the above-described document to be filed on the CM/ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

/s/ Carolyn P. Gurland

Carolyn Gurland
414 North Clay Street
Hinsdale, IL 60521
(312) 420-9263
cgurland@comcast.net